UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | |
| ) | |
| MATHIEU ZAHUI ) | CRIMINAL NO. 26-cr-16 (JEB) |
| ) | |
| Defendant. ) | |
| ) | |

**STATEMENT OF OFFENSE**

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, defendant **MATHIEU ZAHUI** and the United States hereby agree and stipulate the Government's evidence would have shown, beyond a reasonable doubt, the following:

**I.     BACKGROUND**

1. The United States African Development Foundation ("ADF") is an independent U.S. government agency that was established to support and invest in African-owned and African-led business enterprises.

2. Between 2017 and the present, **MATHIEU ZAHUI** served as the Director of Financial Management ("Finance Director") at ADF.  **ZAHUI** referred to himself as the "CFO" of ADF.  **ZAHUI** was a "public official" as defined in Title 18, United States Code, Section 201(a)(1).  **ZAHUI**'s responsibilities ranged from overseeing finance, accounting, information technology and human resources, to reviewing and approving invoices submitted by contractors.

3. Additionally, between December 2022 and the present, **ZAHUI** assumed the role of Contracting Officer Representative for ADF.  As Contracting Officer Representative, **ZAHUI** was responsible for monitoring contractor performance and review and processing of invoices.  He received trainings on properly discharging the duties of Contracting Officer Representative and

acknowledged his understanding of his obligations by signing the Contracting Officer Representative's letters of appointment. **ZAHUI** was aware of his obligation to avoid conflicts of interest with contractors and to immediately inform the Contracting Officer or ADF's ethics counsel if he ever developed a direct or indirect financial interest that could create a conflict of interest involving a contractor.

4. CC-1 was an owner of Kenya-based company Company-1. Previously, CC-1 held various positions in the U.S. government, including as a senior contracting officer and program manager at the Department of Veterans Affairs.

5. **ZAHUI** and CC-1 had known each other since 1999.

## II. ROLE IN ADF CONTRACTING AND RECEIPT OF FUNDS FROM CC-1

6. In late 2019, ADF sought to hire two African-based companies that would provide logistical support for ADF events held in Africa, with one company being French-speaking and the other being English-speaking. **ZAHUI** was in contact with CC-1, and Company-1 submitted a proposal to provide the requested logistical support services for ADF.

7. In March 2020, ADF awarded Company-1 what was known as a "sole-source" contract. A sole-source contract does not involve a competitive bidding process. While ADF had the authority to select a specific contractor and grant it a sole-source contract, ADF was restricted regarding the granting of sole source contracts to certain defined circumstances. As **ZAHUI** knew, ADF was not supposed to award sole-source contracts valued at greater than $100,000. However, when the contract was signed on March 5, 2020 by the Bureau of the Fiscal Service of the U.S. Treasury, the total contract value ended up being $173,640. The stated purpose of the contract was for Company-1 to provide "logistical support" for ADF events.

8. At **ZAHUI**'s direction, ADF eventually extended the contract term and increased

the total value of the 2020 contract from $173,640 to $347,280. **ZAHUI** also oversaw the award of two additional sole-source contracts to Company-1 in the amounts of $350,544 and $93,200 in 2021 and 2023, respectively. Under the terms of these two additional contracts, Company-1's scope of work was the same as in the original, March 2020 contract—the provision of "logistical support" for ADF events.

9.  Between at least June 2020 and December 2023, **ZAHUI** approved the payment of funds to Company-1 despite the fact that Company-1 performed little-to-no actual work. To do this, **ZAHUI** arranged for ADF to pay its vendors and contractors through Company-1 rather than pay them directly. **ZAHUI** then approved invoices for Company-1 that included mark-ups ranging from 17% to 66% on these pass-through invoices, even when Company-1 did no work justifying the mark-up. In total, Company-1 submitted more than 20 pass-through invoices to ADF, for which **ZAHUI** caused ADF to pay at least $617,625.49 to Company-1. Of this total amount paid under the pass-through invoices, Company-1 retained $134.886.34 as a mark-up.

10. For example, leading up to June 2020, ADF owed a substantial past-due debt to Company-2 for staffing services that Company-2 had provided to ADF. Instead of paying Company-2 directly, **ZAHUI** directed Company-2 to issue an invoice to Company-1 pursuant to the conduct described above in paragraph 9. In August 2020, Company-2 issued a $120,000 invoice to Company-1, which had played no role in the IT support services provided by Company-2 to ADF. Shortly thereafter, Company-1 issued a $140,653.08 invoice to ADF, stating that Company-1 had provided "IT Support for logistical assistance" to ADF to earn those funds. Even though **ZAHUI** knew that Company-1 provided no services in connection with Company-2's IT support services to ADF, **ZAHUI** approved the invoice on behalf of ADF. After paying Company-2 $120,000, CC-1 and Company-1 received more than $20,000.

3

11.     In addition to the more than 20 pass-through invoices described in paragraph 9 between April 2020 and December 2023, **ZAHUI** approved other invoices from Company-1 under the contracts described in paragraph 7 through 8 totaling approximately $214,873.83

12.     While the aforementioned contracts were pending, between at least August 2019 and August 2022, **ZAHUI** personally and directly received from CC-1 $12,000 in cash payments, which CC-1 transmitted to **ZAHUI**'s bank account in eight separate payments. **ZAHUI** received and accepted the cash payments because of official acts he performed and would perform to benefit CC-1 and Company-1. These official acts included ensuring that Company-1 continued to secure contracts with ADF, directing funds from ADF to Company-1 through pass-through invoices, and approving Company 1's invoices.

13.     **ZAHUI** and CC-1 did not disclose this conduct to the Bureau of the Fiscal Service, which, as part of the Department of Treasury and as ADF's shared service provider for all invoices, oversaw and authorized ADF's payments to external parties. With **ZAHUI's** involvement, CC-1 falsely stated on Company-1 invoices that Company-1 had provided "logistical support" to ADF when, in fact, Company-1 often acted as a pass-through for payments that had nothing to do with logistical support. For example, in late 2020, ADF owed a membership fee of $50,000 to a professional networking organization serving the African diaspora. Instead of having ADF pay its membership fee directly, **ZAHUI** directed CC-1 to have Company-1 submit an invoice to ADF that included the membership fee so that Company-1 could act as a pass-through for the $50,000 payment to that organization. The invoice submitted claimed that Company-1 provided "logistical assistance support for ADF" and included a mark-up of $9,900.08.

### III.    FALSE STATEMENT TO FEDERAL LAW ENFORCEMENT OFFICERS

14.     On January 11, 2024, **ZAHUI** voluntarily agreed to an interview with special

agents from the U.S. Agency for International Development's Office of Inspector General. During the interview, the special agents told **ZAHUI** that it was a crime to lie during the interviews. The special agents then asked a series of questions regarding **ZAHUI**'s relationship with CC-1, to which **ZAHUI** knowingly and willfully gave a false response that he had never received any benefits from CC-1.

15. This proffer of evidence is not intended to constitute a complete statement of all facts known by defendant **ZAHUI,** but is a minimum statement of facts intended to provide the necessary factual predicate for the guilty plea. The limited purpose of this proffer is to demonstrate that there exists a sufficient legal basis for defendant's plea of guilty to the charged crime.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

LORINDA I. LARYEA
Chief, Fraud Section

By: _____
Sungtae Kang, Virginia Bar No. 90100
Assistant United States Attorney
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20530
(202) 431-0569
Sungtae.Kang@usdoj.gov

By: _____
Kyle Hankey, D.C. Bar No. 1010827
Assistant Chief
Criminal Division, Fraud Section
1400 New York Avenue, N.W.
Washington, D.C. 20530
(202) 549-8941
Kyle.Hankey@usdoj.gov

## DEFENDANT'S ACCEPTANCE

I have read every word of this Statement of Offense. Pursuant to Fed. R. Cr. P. 11, after consulting with my attorney, I agree and stipulate to this Statement of Offense, and declare under penalty of perjury that it is true and correct.

Date: 01/27/2026

MATHIEU ZAHUI
Defendant

I have discussed this Statement of Offense with my client. I concur with his decision to stipulate to this Statement of Offense.

Date: 1/27/2026

KAREN WILLIAMS, Esquire
Attorney for the Defendant

7