**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 26-cr-16 (JEB)** |
| | : | |
| **v.** | : | |
| | : | |
| **MATHIEU ZAHUI,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

Defendant Mathieu Zahui broke the public trust by violating his official duties. The defendant used his executive level position as the Director of Financial Manamgent ("Finance Director") at the U.S. African Development Foundation ("ADF") for his own financial gain and to unlawfully benefit his friend CC-1, and CC-1's company, Company-1. Then, when federal agents asked the defendant about his connections with and receipt of benefits from CC-1, he lied.

The government recommends that the Court impose a term of incarceration at the high end of the United States Sentencing Guidelines ("U.S.S.G.") range (15 months to 21 months) based on a total offense level of 14, which is within Zone D of the Guidelines.[1] *See* PSR at ¶ 118. A sentence of 21 months' imprisonment, along with the imposition of a term of 36 months' supervised release, and imposition of a criminal forfeiture money judgment, is appropriate considering all the factors specified below.

### I.    PROCEDURAL HISTORY

On February 23, 2026, the defendant entered a guilty plea to one count of Receiving a

---

1. As discussed below, the government contends that the two-level enhancement under U.S.S.G. § 3C1.1 applies here on the grounds that the defendant's repeated lies during the interviews with federal agents constituted obstructing or impeding the administration of justice, which would bring the total offense level to 16. The defendant and presentence report writer disagree on this point.

Gratuity as a Public Official, in violation of 18 U.S.C. § 201(c)(1)(B) and one count of Making False Statements to Federal Law Enforcement, in violation of 18 U.S.C. § 1001.  A sentencing is currently scheduled for May 27, 2026, at 10:00 a.m.

## II.    FACTUAL BACKGROUND

ADF is an independent U.S. government agency that was created for the purpose of supporting African-owned and African-led business enterprises. *See* Statement of Offense ¶ 1. According to the U.S. Government Manual, the African Development Foundation Act passed in 1980 envisioned ADF enabling the people of African countries to develop their potential and lead more productive lives by "supporting local self-help activities that enlarge community development opportunities, promoting effective and expansive African participation in their development process, and promoting development institutions that are indigenous to particular African countries and responsive to the requirements of those countries' poor people."[2]

The defendant has an impressive academic background, including advanced degrees in Master of Business Administration in Financial Management and Master of Professional Studies in Applied Economics; he is also a certified Government Financial Manager. *See* Presentence Investigation Report ("PSR") ¶¶ 81-84.  The defendant began his career at ADF as a budget analyst in 2010 and spent the next 15 years rising through the organization to ultimately attain the rank of Finance Director. *See* PSR ¶ 90.  In that role, the defendant essentially served as the organization's CFO, a position that entrusted him with substantial authority and discretion over financial matters, including the review and approval of invoices, which were to be paid for by U.S. taxpayer's money. *See* Statement of Offense ¶ 2.  Since December 2020, the defendant was also entrusted with the

---

2. The United States Government Manual on the establishment and organization of the United States African Development Foundation (https://usgovernmentmanual.gov/Agency?EntityId=N1pd1+cwH9Q=&ParentEId=+klubNxgV0o=&EType=jY3M4 CTKVHY=)

role of Contracting Officer Representative for ADF, which meant that he was responsible for monitoring contractors' performance and review and processing of invoices. He also received separate training on properly discharging the duties of Contracting Officer Representative and his obligations to avoid conflicts of interest with contractors. *See* Statement of Offense ¶ 3. Rather than honoring the responsibilities inherent in those positions, however, the defendant exploited his authority to benefit CC-1 and Company-1, as well as himself.

The defendant's preferential treatment of Company-1 dates back to March 2020, when ADF awarded Company-1 a "sole-source" contract, thereby exempting Company-1 from the competitive bidding process. Although ADF had authority to grant sole-source contracts to contractors, that authority was subject to certain restrictions, including a $100,000 cap on the value of the sole-source contract. Yet, under the defendant's direction, Company-1 not only secured the initial sole-source contract valued at $173,640, far exceeding the $100,000 threshold, but also received two additional sole-source contracts each totaling $350,544 and $93,200. *See* Statement of Offense ¶ 7.

```
████████:   The justification that is provided for sole
            sourcing to [Company-1] is, uh, an urgent
            need for travel the upcoming year.
ZAHUI:      Yeah.
████████:   Which would have been 2020. Um, in 2020,
            this was the beginning of COVID, was there
            traveling that was happening in 2020?
ZAHUI:      No. No. No. No. We all the way to March—
            March— March, uh, 2020, no. Up to we stopped
            March 20th. Everything all the travel would
            stopped.
```

The defendant's rationale for awarding sole-source contracts to Company-1 made no sense at all. As shown above, on January 11, 2024, when interviewed by federal agents about the purpose of these sole-source contracts awarded to Company-1, the defendant said it was due to an urgent need for travel the upcoming year, despite his own admission that no travel was happening in 2020 due to COVID-19.

According to the contracts' stated scope of work, Company-1 was to provide "logistical support" services for ADF events. In reality, however, Company-1 provided no such service. Instead, these contracts served as mere vehicles through which the defendant unlawfully directed ADF funds to Company-1. As the defendant admitted in his statement of offense, he approved invoices submitted by Company-1 despite knowing that the invoices were illegitimate and unsupported by any actual work performed by Company-1. *See* Statement of Offense ¶ 9.

To further facilitate that undertaking, the defendant arranged for other ADF contractors performing actual work for ADF to route payments through Company-1. The defendant then approved these pass-through invoices submitted by Company-1 to ADF, allowing his friend to collect markups ranging from 17% to 66%. *Id.*

**Bill To**

POC:

| Prime Cont. No. | Contract Type | Funded Amount | Funded Fee | Fund. Rem. | Project No. | Due Date |
|---|---|---|---|---|---|---|
| | FFP | 120,000 | | 0.00 | 3850 | 07/30/20 |

| Description | | | Current | |
|---|---|---|---|---|
| | Rate | | Hrs | Billing |
| **Fee** | | | | |
| BY-23 Services Rendered + Interest/Principal | | | | |
| Fee | | | | 120,000.00 |
| | Fee Subtotal | | | 120,000.00 |
| | Withholding | | | 0.00 |
| | Invoice Subtotal | | | 120,000.00 |

As illustrated above, in one instance, the defendant directed a staffing company, Company-2, to whom ADF owed a substantial past-due debt to issue a $120,000 invoice to Company-1, which had played no role whatsoever. Shortly thereafter, Company-1 issued a $140,653.08 invoice to ADF. Although the defendant knew that Company-1 provided no services to ADF, he approved the invoice on behalf of ADF, allowing CC-1 and Company-1 to receive more than a $20,000 mark-up for doing absolutely nothing. *See* Statement of Offense ¶ 10.

The defendant was careful to cover his tracks. The Bureau of Fiscal Service ("BFS"), a sub-agency under the Department of the Treasury, was responsible for overseeing and authorizing ADF's payments to external parties and thus required expenditures to conform to the contractual scope of work. Being aware of BFS's scrutiny, the defendant ensured that the invoices consistently referenced logistical support or logistical assistance services, even when the invoices had nothing

to do with logistics. *See* Statement of Offense ¶ 13.

For example, upon noticing that Company-2's invoice above referenced "By-23 Services Rendered + Interest/Principal," the defendant had Company-2 change the description of the service to falsely reflect that it had provided logistical services to Company-1.

| CC-1 | 8/6/2020, 5:20 PM |
|------|-------------------|
| Hi, any word on the invoice and other issues we discussed? | |
| **Mathieu Z** | 8/6/2020, 5:47 PM |
| I just discussed the invoices today with ▮. They will be changing them and you should receive them by tomorrow. Other issues you will receive them by tomorrow.  I am on leave to rest my hands. How is e everything there | |

As shown in the communications above, the defendant then informed CC-1 that he had spoken with Company-2 regarding revising the language on the invoice and that Company-2 would issue a revised invoice the next day.

| From: | ▮ |
|-------|---|
| Sent: | Fri 8/7/2020 4:02:19 PM (UTC) |
| To: | ▮ Mathieu Zahui[mzahui@usadf.gov] |
| Subject: | RE: INV-3850-001R |
| Attachment: | 3850-001R-06302020.pdf |

The attached invoice 3850-001R is the replacement invoice for 3850-001.

Thank you for your attention to this matter

Please let us know if you have any question or concerns

Sincerely.



Consistent with the defendant's statement, Company-1 received from Company-2 an email with a revised invoice as the attachment the very next day, which as shown above, reflects "IT Support for Logistical Assistance."  Again, Company-1 had no involvement whatsoever in providing such service. *See* Statement of Offense ¶ 10.



The revised invoice then allowed Company-1 to submit the above invoice to ADF and

7

collect more than $20,000 in mark-up merely for its participation in the pass-through arrangement. Using a similar method, Company-1 submitted more than 20 pass-through invoices to ADF over the course of approximately three years and collected a total of $134,886.34 mark-ups despite performing no legitimate work. *See* Statement of Offense ¶ 9.

The benefits of this unlawful arrangement did not flow in only one direction. While the defendant used his official position to steer payments to CC-1 and Company-1, the defendant also personally benefitted from the arrangement. During the pendency of these contracts, CC-1 provided the defendant with a total of $12,000 in eight separate cash payments, further demonstrating the corrupt nature of the defendant's and CC-1's relationship.

As mentioned above, on January 11, 2024, federal agents interviewed the defendant.

```
███████:   Did you develop a friendship?

ZAHUI:     With, uh, with [CC-1]? Uh, friendship, uh, in a sense that yeah like
           a— Yeah, we say hi. [U/I]. Yes.

███████:   Did you communicate via telephone or email?

ZAHUI:     Oh, yeah. We communicate. Yeah. [U/I]—

███████:   How freq— How [U/I] frequently did you communicate?

ZAHUI:     Mm. Um, I'm— I'm not a good at a— main— maintaining friend
           communication with friends. So I— I frequently communicate with him,
           not that much though, because, uh, uh, roughly, I would say, in the
           course of this contract, communicate with him, but prior to that,
           that's what you're saying?

███████:   Mm-hm.

ZAHUI:     Okay. Prior to that, uh, not that much though. Because, uh, I stay
           in San Diego and he had left San Diego. So— so, um, I would have
           probably said prior to this contract, maybe once, uh, once, uh
           [U/I]— It's not even a month. I— I— I can't really, but like maybe
           in a year, I can talk to him, uh, maybe two or three time in a year.
```

During the interview, the defendant was asked about his relationship with CC-1, including the nature of their relationship and the frequency of their communications before the contract was signed.  Contrary to the representations the defendant made above, the federal agents learned— only after reviewing the defendant's phone records and emails—that the defendant and CC-1 had an extremely close relationship and communicated extensively leading up to the contract signing. For example, in one month alone, they spoke nearly every day.

```
███████:   Did you ever direct [CC-1] to make payments to U.S. based employees?

ZAHUI:     Directed him to make a payment to U.S. based employee? Now, uh, if
           there there's— no not U.S. based employee. Uh, somebody that work
           for USADF?

███████:   Yes.

ZAHUI:     No. The— the only— the only payment that I'm aware of that they got
           made, it got made again, uh, is, uh, on, uh, I would say that I ,
           uh, I directed it has to be, uh, again, uh, this, uh, it has to be
           ████. That's— that's the only thing that I can think of. Uh, ████
           and, uh—
```

The defendant was also asked about working with CC-1 to make payments to U.S.-based ADF employees.  Contrary to the defendant's statements above, the evidence later revealed numerous instances in which the defendant directed Company-1 to submit invoices to ADF for the purpose of paying certain U.S.-based ADF employees, while Company-1 retained mark-ups, again, for doing nothing.  These facts did not come to light until much later, only after the federal agents conducted extensive email and invoice reviews and cross-referenced the records.

9

```
            :    Did you receive any benefit from him
                 directly or indirectly?
ZAHUI:           No. That on— that one, I can respond to that
                 one.
```

Then, during the first interview with the federal agents on January 11, 2024, the defendant lied by stating that he had never received any benefits from CC-1. *See* Statement of Offense ¶ 14.

```
            :    Did you have a relationship where he would
                 do things for you without— without them
                 being true?
ZAHUI:           Oh, no, no, no, no, no, no, no, no, no, no,
                 no, no, no, no.
```

During the second interview on February 1, 2024, when asked if CC-1 had done things for the defendant that were not true, the defendant lied to the federal agents once again. The federal agents learned the full extent of the defendant's lies only after reviewing his phone, emails and ADF records.

## III.    STATUTORY PENALTIES

For a violation of 18 U.S.C. § 201(c)(1)(B), the defendant faces a maximum sentence of two years of imprisonment; a fine of up to $250,000 or twice the pecuniary gain or loss of the offense; a term of supervised release of up to one year; an obligation to pay any applicable interest or penalties on fines and restitution not timely made; and a $100 special assessment. *See* PSR ¶¶ 102, 108, 124 and 125.

For a violation of 18 U.S.C. § 1001, the defendant faces a maximum sentence of five years of imprisonment; a fine of up to $250,000 or twice the pecuniary gain or loss of the offense; a term of supervised release of up to three years; an obligation to pay any applicable interest or penalties on fines and restitution not timely made; and a $100 special assessment. *See* PSR ¶¶ 103, 109, 124, and 125.

## IV.     THE APPLICABLE SENTENCING GUIDELINES RANGE

The Supreme Court has declared that, in terms of determining an appropriate sentence, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *United States v. Gall*, 552 U.S. 38, 49 (2007) (citation omitted).  Although advisory, the Guidelines assure some measure of uniformity in sentencing, fulfilling a key Congressional goal in adopting the Sentencing Reform Act of 1984.  Reference to the Guidelines, while carefully considering the factors set forth in 18 U.S.C. § 3553(a) particularly relevant to an individual defendant, minimizes the disfavored result of disparate sentences by different judges for the same criminal conduct.  Therefore, the Supreme Court has held that districts should "remain cognizant of [the Guidelines] throughout the sentencing process." *Id*., at 50 n.6.

The following guideline provisions are not in dispute by the parties or the presentence report writer:

| | |
|---|---|
| Base Level Offense § 2C1.2(a)(1) | 11 |
| More than One Gratuity § 2C1.2(b)(1) | +2 |
| Value of the Gratuity more than $6,500 §§ 2C1.2(b)(2) & 2B1.1(b)(1)(B) | +2 |
| High-level Decision-Making Position § 2C1.2(b)(3) | +4 |
| Acceptance of Responsibility § 3E1.1(a) and (b) | -3 |

Adjustment for Zero-Point Offender                    -2

Total                                                  14

PSR ¶¶ 28-45.  The parties disagree, however, over whether an upward adjustment of two levels

is appropriate pursuant to U.S.S.G. § 3C1.1.  The government believes that an additional two-level

increase is warranted because the defendant substantially impeded the administration of justice

through his continuous lies.  As discussed above, the defendant repeatedly provided false

statements to the federal agents, and he stuck with his falsehoods through two rounds of interviews.

The government contends that the defendant's conduct constituted a willful attempt at obstruction

of justice, an attempt to avoid exposure and prosecution.  The truth was only uncovered after an

extensive investigation into the defendant's phone, emails and ADF records was conducted.  If the

defendant is found to have impeded the administration of justice, the offense level is 16 and the

applicable guidelines range is 21 to 27 months.  Otherwise, the applicable guidelines range is 15

to 21 months.  In either scenario, the government believes that a sentence of 21 months'

imprisonment is appropriate in this case.

## V.    **GOVERNMENT'S RECOMMENDATION**

### A.  Analysis of the Sentencing Factors Under Section 3553(a)

After calculating the applicable Guidelines range, the Court should next consider all the

applicable factors set forth in 18 U.S.C. § 3553(a). Indeed, the Guidelines themselves are

designed to calculate sentences in a way that implements the considerations relevant to

sentencing as articulated in Section 3553(a). *Rita v. United States*, 127 S. Ct. 2456, 2463 (2007).

The Court must impose a sentence that is sufficient but not greater than necessary to reflect the

seriousness of the offense to promote respect for the law, to provide just punishment, to afford

adequate deterrence, to protect the public from further crimes of the defendant, and to provide

the defendant with needed educational or vocational treatment. 18 U.S.C. § 3553(a)(2). The

Court also must consider the nature and circumstances of the offense, the history and

characteristics of the defendant, the kinds of sentences available, the sentencing range under the

Guidelines, any relevant policy statements, the need to avoid unwarranted sentencing disparities,

and the need to provide restitution to the victims.  18 U.S.C. § 3553(a)(1)-(7).

### 1.  Nature and Circumstances of the Offense

The nature and circumstances of the offense support the imposition of a meaningful

sentence.  As discussed above, the defendant carried out the unlawful arrangement in a deliberate

and methodical manner over an extended period of time.  This was not a momentary lapse in

judgment or an isolated act of misconduct.  The defendant is a highly educated and sophisticated

individual with an impressive academic and professional background.   Over the course of

approximately fifteen years with ADF, he accumulated significant institutional knowledge and

rose to a position of substantial authority, especially over financial operations.  Rather than use his

education, experience and expertise to safeguard the organization and public funds, however, the

defendant leveraged those attributes and his institutional knowledge to facilitate unlawful

transactions,  conceal the true nature of the transactions, and avoid scrutiny from the government

agency responsible for authorizing those payments.

The defendant occupied a position that was intended to prevent precisely this type of

misconduct.  He even received special training on the importance of adhering to highest ethical

standards as Contracting Officer Representative.   Instead of fulfilling that responsibility, the

defendant exploited his authority and abused public trust for personal and corrupt purposes.

**2. The Need for the Sentence to Reflect the Seriousness of the Offense, to Promote Respect for the Law, to Provide Just Punishment for the Offense and to Afford Adequate Deterrence to Criminal Conduct**

The need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense and to afford adequate deterrence to criminal conduct likewise weighs in favor of a meaningful sentence. ADF was established to serve an important public purpose. Conduct such as the defendant's undermines public confidence not only in the integrity of the organization itself, but also in the broader institutions entrusted with public funds. Members of the public could reasonably question the legitimacy and stewardship of the organization when a senior official entrusted with financial oversight instead manipulates the system for the benefit of himself and his friend. A meaningful sentence is therefore necessary to make clear that individuals who abuse positions of trust and misuse public funds for personal gain will be held accountable, and to deter others in similar positions from engaging in comparable conduct.

**3. Defendant's History and Characteristics**

The defendant has no known criminal history, which is accurately reflected in his low criminal history category.

**B. The Defendant Should Be Required to Pay a Forfeiture Money Judgment**

"Criminal forfeiture is not an independent substantive offense, nor is it even an element of an offense. It is instead 'an aspect of punishment imposed following conviction of a substantive criminal offense.'" *United States v. Day*, 416 F. Supp. 2d 79, 84 (D.D.C. 2006) (quoting *Libretti v. United States*, 516 U.S. 29, 39 (U.S. 1995)), aff'd in part on other grounds and rev'd in part on other grounds, 524 F.3d 1361 (D.C. Cir. 2008). Criminal forfeiture may take the form of: (1) an *in personam* money judgment against the defendant; (2) forfeiture of

14

specific assets; and (3) forfeiture of "substitute assets" if the directly forfeitable assets are unavailable. *United States v. Zorrilla-Echevarria*, 671 F.3d 1, 5-6 (1st Cir. 2011) (citation omitted).

As part of the defendant's plea, the defendant agreed to pay a criminal money judgment based upon the amount of proceeds he obtained as a result of the crime, that is, the $12,000 cash payments the defendant received from CC-1. Thus, the government requests that a money judgment in the amount of $12,000 be imposed at the time of the defendant's sentencing.

## VI.    CONCLUSION

For the foregoing reasons, the government respectfully recommends the Court impose a term of 21 months' incarceration, followed by a term of 36-month period of supervised release, a criminal forfeiture money judgment in the amount of $12,000, and a special assessment of $100.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:      /s/ Sungtae Kang
SUNGTAE KANG, VA Bar. No. 90100
Assistant United States Attorney
601 D Street, NW
Washington, D.C. 20530
(202) 252-6767

## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2026, a copy of this memorandum was sent via electronic case filing to counsel for the defendant.

 /s/ Sungtae Kang
Sungtae Kang
Assistant United States Attorney